Judge Terri F. Love
Relator, Antonio Gallagher, seeks review of the trial court's March 22, 2019 finding that his guilty plea bargain was knowingly, intelligently, and freely entered. Specifically, Mr. Gallagher contends *1287 that the trial court erred by 1) refusing to take testimony or evidence regarding events that occurred after his plea; 2) by not finding that his plea was induced by a broken promise, and 3) by not finding that the memorandum of understanding was invalid under contract law. Mr. Gallagher's contentions have merit.
Upon review, we find that the trial court did not follow this Court's previous instructions on remand for determining whether Mr. Gallagher's plea bargain was constitutionally infirm. Therefore, we grant the writ, vacate the trial court's judgment, and remand the matter for further proceedings consistent with this opinion.
Factual Background and Procedural History
Mr. Gallagher was charged by bill of information with possession with intent to distribute cocaine, a violation of La. R.S. 40:967(B)(1). Mr. Gallagher entered a plea of guilty as charged and received a combination of a suspended sentence and probation. Mr. Gallagher also executed a Memorandum of Understanding ("MOU") signed by himself, defense counsel and the district attorney concerning the terms of his plea. Mr. Gallagher was released pursuant to the MOU to effectuate the terms outlined therein.
Mr. Gallagher subsequently filed a Motion to Withdraw Guilty Plea. Defense counsel and the State presented argument regarding Mr. Gallagher's motion to withdraw guilty plea and motion to set evidentiary hearing. Because defense counsel expressed the intent to call Mr. Gallagher's prior counsel, who was also the law clerk to the Honorable Laurie White in Section "A", Judge White recused herself and ordered the case be reassigned to another section of court for the purpose of the motion to withdraw the guilty plea only.
The matter was re-allotted to Section "G." The Honorable Judge Byron Williams heard argument and reviewed memoranda as to Mr. Gallagher's motion to withdraw the guilty plea. However, no testimony was presented. The court denied Mr. Gallagher's motion to withdraw the guilty plea without conducting an evidentiary hearing. Mr. Gallagher objected and noticed his intention to seek writs.
In State v. Gallagher , 18-0183 (La. App. 4 Cir. 6/7/18), 249 So. 3d 915, writ denied , 18-1003 (La. 10/8/2018), 253 So. 3d 799, this Court granted Mr. Gallagher's writ, vacated the trial court's denial of his motion to withdraw guilty plea, and remanded the matter to the trial court to conduct "an evidentiary hearing regarding the validity, terms, and parties' compliance with the MOU and then to determine whether defendant has established his guilty plea was constitutionally infirm." Id. , 18-0183, p. 15, 249 So. 3d at 924.
Pursuant to this Court's order, an evidentiary hearing was conducted in Section "G" with the Honorable Denis Waldron sitting ad hoc.
Testimony
Lindsay Jeffrey, Mr. Gallagher's attorney when the guilty plea and MOU were negotiated and executed, testified that prior to becoming Judge White's Law Clerk she worked as an Orleans Public Defender and represented Mr. Gallagher. As part of her defense, a MOU was entered into between Mr. Gallagher and the State. Attorney Jeffrey explained that the terms of the MOU offered Mr. Gallagher a probated sentence if he would cooperate with the FBI and the State of Louisiana. The cooperation required that Mr. Gallagher become an informant and conduct drug buys to assist law enforcement agents find and convict other drug dealers. At the time the MOU was executed, Mr. Gallagher had been in jail for several months. Attorney *1288 Jeffery recalled Mr. Gallagher expressing concern because he had no money, clothes, or financial resources in the presence of the FBI. Attorney Jeffery stated the FBI agent was aware that Mr. Gallagher would need financial assistance to perform his role as a drug buyer. Attorney Jeffery had no contact with Mr. Gallagher after he was released from jail. To her knowledge, Mr. Gallagher did not have a phone.
At the meeting with the FBI agents, Mr. Gallagher provided the names of several targets for conducting controlled narcotic purchases. Attorney Jeffery could not recall specific targets Mr. Gallagher mentioned to the FBI for investigation.
The State asked Attorney Jeffery whether the FBI made any promises relating to subsidizing Mr. Gallagher's housing, transportation, and clothing, such that he could look the part of a drug kingpin. Attorney Jeffrey stated she did not recall any specific promises that were made by the FBI agents. However, she did recall being satisfied that Mr. Gallagher would receive some kind of assistance. Attorney Jeffery did not recall the FBI promising to pay for his housing, transportation, subsistence, food, water or any maintenance during the period of his cooperation under the MOU. Attorney Jeffery stated she thought Mr. Gallagher expected the FBI to assist him with food when he first got out of jail. However, Attorney Jeffery stated, "No, I cannot recall any specifics of any specific thing that was going to be provided by the FBI." To clarify, the State inquired:
State: If I understand correctly your response is, no you don't remember that Agent, [sic] McMillan, making any specific promises or representations of the FBI buying Mr. Gallagher's food at that meeting.
Attorney Jeffery: No, I do not.
Attorney Jeffery recalled a discussion about clothing, but did not recall the FBI stating clothing would be provided. When asked, "Do you have any recollection any specifics that the FBI offered, or represented, or indicated they would provide to Mr. Gallagher to support his function as a confidential source?" Attorney Jeffery replied, "No."
Attorney Jeffery stated that the terms of each provision of the MOU were reviewed with Mr. Gallagher prior to signing the document. Attorney Jeffery did not recall any discussion relating to adding any provisions relative to food, shelter, clothing, or transportation to the MOU. Attorney Jeffery stated it was her practice to have reviewed the terms of an MOU with a client before allowing him to sign it.
The hearing continued with the testimony of FBI Special Agent Sheila McMillan. Agent McMillan testified she had been a special agent with the FBI for a few years. Mr. Gallagher's cooperation agreement was the first such agreement in which Agent McMillan participated. Agent McMillan explained that these types of agreements normally start when a defendant indicates a willingness to cooperate with the FBI and to help the FBI make a case against a person. Typically, a defendant would be released to start learning information and relate that information to the FBI. The cooperating defendant is required to maintain contact with the FBI and keep the FBI updated. With regard to cooperating defendants, Agent McMillan also stated:
The reason we get interested in them in the first place is they have information on a subject that we are already interested in, and already want to investigate, and so they say they have this information and they have an in with the subject. And so we ask them if they are willing to work with us.
*1289 The cooperating defendant would orchestrate controlled purchases with individuals they already know. The defendant/cooperator would be equipped with an audio/video recording device. Once the buy was set up, the defendant would be followed to the scene of the location of the buy. The cooperating defendant would be given money by the FBI to make the drug purchase.
In contemplation of this scenario, defense counsel asked:
And what if the person you are working with doesn't have enough money to buy a phone? Do you provide money to buy a phone? ...
Agent McMillan: We have before. We have to come up with some explanation of why we want to give them money. So usually they give us some kind of information, and then we can write up that they have given us information, and based on that we want to give them money for a phone, and of course that would be approved so we can get that. But sometimes we give them a phone sometimes they get their own phone.
In response to defense counsel's question regarding money to purchase clothing, Agent McMillan replied:
We can, but we have to have a reason to believe that they are going to give information it's going to work out. So if they can provide us with any sort of information we can type a request from our supervisor to give money to get some clothes a phone or anything like that. Which he never did provide us with any information.
Agent McMillan stated when she first met with Mr. Gallagher, he told her he did not have a phone, so she asked that he provide her with a relative's phone number to maintain contact. Mr. Gallagher provided her with the phone number of his sister. However, when Agent McMillan called the number, the woman who answered said she did not know Mr. Gallagher. Mr. Gallagher asked whether she could get him clothing and she replied, "I said maybe but you got to give me a reason to justify us giving you money as a form of payment. You have to give us some information, you have to give us something that I can type up and submit to the boss saying we should pay him something." At some point, Mr. Gallagher contacted Agent McMillan from a pay phone stating he did not have any information. He advised Agent McMillan that he would be getting a cell phone that day but she never heard from him again. Agent McMillan stated Mr. Gallagher never set up any drug buys. Mr. Gallagher was never provided any financial assistance because he never provided the FBI with any information.
On cross examination by the State, Agent McMillan stated it was never represented that Mr. Gallagher would be provided with food, water, clothing, shelter at federal expense, a vehicle or a cell phone.
FBI Agent Jason Quick was called as a witness and testified regarding the MOU. Agent Quick stated he attended a meeting with Mr. Gallagher, his attorney and the State concerning Mr. Gallagher's desire to work as a confidential informant. Mr. Gallagher indicated to Agent Quick that in the past he had been offered four ounces of heroin on credit from someone for resale. Agent Quick stated it was up to Mr. Gallagher to make whatever contacts were needed to re-engage with the heroin dealer. Regarding a cell phone, Agent Quick stated: "I would have been happy to give him a phone if I had met him one time where he would have given me one piece of information, or met me to even start something with an honest try; but that never happened."
On examination by the State, Agent Quick stated that while functioning as a *1290 confidential source, it was never represented to Mr. Gallagher that he would be provided with food, water, clothing, shelter, or a vehicle at government expense. The possibility of providing a cell phone was discussed if Mr. Gallagher provided information showing a good faith effort towards narcotics investigation of the target he identified. However, no representation was made that Mr. Gallagher would automatically be provided with a cell phone when released.
Mr. Gallagher testified at the hearing that in exchange for a better deal, he would perform controlled buys with individuals he knew. Mr. Gallagher said he "made it understood" that he was not in a financial position to purchase the narcotics. Mr. Gallagher said he was told the money would be provided to him to make the narcotics buy(s). Mr. Gallagher said he was informed that if necessary he would be provided with a cell phone. Mr. Gallagher was also told if he needed help getting from "Point A" to "Point B," assistance would be provided. Mr. Gallagher said it was his understanding that the FBI would help with basic necessities. Mr. Gallagher stated when he informed Agent McMillan that he did not have proper clothing or a cell phone, Agent McMillan replied that she was sure there was somebody who could help him. Mr. Gallagher told Agent McMillan he would try to get assistance from his sister. Mr. Gallagher stated he was under the impression that help would be provided because it was obvious he had nothing. Mr. Gallagher said he would not have signed the MOU and entered the plea had he known he would not be provided assistance.
Following testimony and argument by counsel, Judge Waldron stated:
[I]t is the specific allegation that all of the parameters if you will of this so-called Memorandum of Understanding were clearly not understood by the Defendant.
* * *
The defendant before the Court according to the colloquy that was taken was forty-five years old at the time he appeared before Her Honor Judge White. He answered the Court as to the inquire [sic] of his education background by I believe by saying he had a GED and that he obtained another degree while in jail....
So clearly at the time Mr. Gallagher entered into this agreement, he understood the danger of it. He was obviously a man of some education, some experience, he's forty-five years of age. Those [are] things that the Court has taken notice of and is very contentious [sic] of in deciding this singular issue of whether or not his plea was freely and voluntarily entered.
He indicated he was satisfied with his Attorney when questioned by the Judge.
* * *
I ultimately conclude based on everything including the testimony [of the attorney] who represented the Gentleman and everything that was presented here today including the documents I have reviewed that this plea of guilty was knowingly, intelligently, freely, and voluntarily entered into.
* * *
I would deny any right or request that he has made before this Court to withdraw his guilty plea that was entered before Her Honor Judge Lori White.
I remand this case to Her Honor White ... now to decide the secondary issue of whether or not any particular types of sentence can be imposed in this case or should be imposed in this case based on her finding as to whether or *1291 not there has been a violation of the agreement that became obligatory on the part of the defendant because his plea of guilty was freely and voluntarily made and accepted by the Court. That is a secondary issue that is left to Her Honor to decide. That did not involve the Lady that is now her Law Clerk, the attorney who then represented {SIC} Mr. Jeffrey.
I note objection for the Defense to protect the record. And I order the case remanded to the care of Her Honor in her infinite wisdom and discretion on the remaining issue.
Guilty Plea Withdrawal
Louisiana Code of Criminal Procedure Article 559(A) provides that a court "may permit a plea of guilty to be withdrawn at any time before sentence." In addition, the Louisiana Supreme Court in State v. Lewis , 421 So. 2d 224 (La. 1982), held that a trial court may permit the withdrawal of a guilty plea after sentencing if the court finds that the guilty plea was not entered freely and voluntarily, or if there was an inadequate colloquy advising the defendant of the rights he was waiving by pleading guilty and therefore was constitutionally infirm. However, there is "no absolute right to withdraw a previously entered plea of guilty." State v. Pichon , 96-0886, p. 2 (La. App. 4 Cir. 11/20/96), 684 So. 2d 501, 502. The withdrawal of a guilty plea is within the discretion of the trial court and is subject to reversal only if that discretion is abused or arbitrarily exercised. State v. Johnson , 406 So. 2d 569, 571 (La. 1981).
"For a guilty plea to be found valid, there must be a showing that the defendant was informed of and waived his constitutionally guaranteed right to trial by jury, right of confrontation and right against compulsory self-incrimination." State v. Rhea , 04-0091, p. 3 (La. App. 4 Cir. 5/19/04), 876 So. 2d 131, 134 (citing Boykin v. Alabama , 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). "In determining whether the defendant's plea is knowing and voluntary, the court must not only look to the colloquy concerning the waiver of rights, but also other factors which may have a bearing on the decision." State v. Young , 11-0046, p. 8 (La. App. 4 Cir. 8/17/11), 71 So. 3d 565, 571. "Similarly, in reviewing whether the trial court abused its discretion, courts have looked to the guilty plea colloquy to determine whether the defendant was advised of the consequences of his plea and whether he voluntarily and intelligently waived his rights." Id.
"[A] guilty plea is constitutionally infirm when a defendant is induced to enter that plea by a plea bargain or by what he justifiably believes was a plea bargain, and that bargain is not kept." State v. Dixon , 449 So. 2d 463, 464 (La. 1984). "[I]f a defendant's misunderstanding is not induced by or attributed to representations made by the district attorney or the trial court, there is no grounds for invalidating the guilty plea." State v. Readoux, 614 So. 2d 175, 176 (La. App. 3rd Cir. 1993).
Trial Court's Compliance with Remand Instructions
At the hearing, the trial court stated that "[a]gain, this is not a challenge to the lack of proper Boykinization , yet repeatedly stated that the only issue before it was whether Mr. Gallagher's plea bargain "was knowingly, intelligently, freely, and voluntarily" entered. The trial court also repeatedly noted that the matter would be remanded to the previously recused trial court judge to determine whether a violation of the MOU occurred.
*1292 In the previous writ, this Court remanded "this matter to Section 'G' [Judge Byron Williams] for an evidentiary hearing regarding the validity, terms, and parties' compliance with the MOU and then to determine whether [Mr. Gallagher] has established that his guilty plea was constitutionally infirm. Gallagher , 18-0183, p. 15, 249 So. 3d at 924. Instead, the trial court further complicated the matter by attempting to bifurcate the issue and limiting the evidence presented at the hearing. The issue of whether Mr. Gallagher's plea bargain is constitutionally infirm includes determining whether the MOU was violated.
We find that the trial court did not comply with this Court's previous instructions on remand. Accordingly, the judgment of the trial court is vacated and the matter is remanded "to Section 'G' [Judge Byron Williams] for an evidentiary hearing regarding the validity, terms, and parties' compliance with the MOU and then to determine whether defendant has established that his guilty plea was constitutionally infirm."
Decree
For the above-mentioned reasons, we find that the trial court did not follow our directive from our previous remand. Therefore, we grant the writ, vacate the judgment of the trial court, and remand the matter for further proceedings consistent with this opinion.
WRIT GRANTED; JUDGMENT VACATED; REMANDED
JENKINS, J., DISSENTS WITH REASONS
JENKINS, J., DISSENTS WITH REASONS
Upon review of the record of the proceedings in the district court, I find the district court adequately complied with the remand instructions from this Court in State v. Gallagher , 18-0183 (La. App. 4 Cir. 6/7/18), 249 So.3d 915, writ denied , 18-1003 (La. 10/8/18), 253 So.3d 799, and I find no abuse of discretion in the trial court's denial of defendant's motion to withdraw guilty plea. Accordingly, I would deny defendant's writ.